IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

STEPHEN IRELAND,

        Plaintiff,

    v.

BEND NEUROLOGICAL ASSOCIATES LLC, an Oregon limited liability company; BEND MEMORIAL CLINIC, P.C., an Oregon professional corporation; MICHAEL BELL M.D., P.C., an Oregon professional corporation; MICHAEL BELL M.D., an individual; DAVID T. SCHLOESSER M.D., P.C., an Oregon professional corporation; DAVID SCHLOESSER M.D., an individual; LAURA J. SCHABEN M.D., P.C., an Oregon professional corporation; LAURA SCHABEN M.D., an individual; FRANCENA ABENDROTH M.D., an individual; CRAIGAN GRIFFIN M.D., an individual; GARY BUCHHOLZ M.D., an individual; and GARY D. BUCHHOLZ M.D., P.C., an Oregon professional corporation,

        Defendants.

Case No. 6:16-cv-02054-JR

FINDINGS AND RECOMMENDATION

Page 1 – FINDINGS AND RECOMMENDATION

RUSSO, Magistrate Judge:

Pro se plaintiff Stephen Ireland moves for leave to file an amended complaint pursuant to Fed. R. Civ. P. 15. For the reasons set forth below, plaintiff's motion should be denied.

## BACKGROUND

Plaintiff and individual defendants David Schloesser, Michael Bell, Gary Buchholz, Laura Schaben, Francena Abendroth, and Craigan Griffin are neurologists. Proposed First Amended Complaint ("FAC") ¶¶ 1, 18, 26-31 (doc. 73). Prior to August 2015, plaintiff and the individual defendants practiced in Bend, Oregon, with corresponding hospital privileges at St. Charles Medical Center-Bend ("SCMC"). Id. Insurance providers "in the Bend service area require . . . physicians provide hospital coverage for their patients." Id. at ¶ 42. Similarly, SCMC's bylaws require physicians to supply emergency call coverage for their patients: "if a physician's patient presents . . . with a problem that falls within that physician's scope of practice and requires immediate in-person evaluation, the physician, or another physician with similar training, must be present at the bedside within 40 minutes." Id. at ¶ 38. Failure to comply with SCMC's bylaws "can result in disciplinary action, including the loss of medical staff privileges." Id. at ¶ 39.

At some unspecified time, plaintiff opened his own clinic, Neurology of Bend ("NOB"). Id. at ¶ 19. Schloesser, Bell, and Buchholz were formerly partners at or employed by NOB, although each exited plaintiff's practice by April 2013. Id. at ¶¶ 76-77. Schloesser and Bell, along with Schaben, subsequently became members of Bend Neurological Associates ("BNA"). Id. at ¶¶ 28-29. Abendroth and Griffin were employed by Bend Memorial Clinic ("BMC") at all

relevant times; Buchholz joined BMC in April 2014, where he practiced until retiring in "the fall of 2014." Id. at ¶¶ 26, 31.

Due to "the very large overhead" associated with NOB, plaintiff's income "decreased drastically" when Buchholz left. Id. at ¶ 76. Accordingly, in "early 2013," plaintiff "ran advertisements for an associate" through a national on-line service. Id. at ¶ 79. BNA and BMC "advertised for associates in the same on-line service" around the same time, "as there was a long-standing shortage of neurologists in the area." Id. at ¶¶ 78-79; Ireland v. Bend Neurological Assocs. LLC, 2017 WL 3404970, *1 (D. Or. May 23), adopted by 2017 WL 3401268 (D. Or. Aug. 8, 2017).

On June 6, 2013, Bell, Schaben, Schloesser, Griffin, and Abendroth sent plaintiff a letter specifying that, beginning July 1, 2013,[1] they would "no longer call share with you and your practice." FAC ¶ 45 (doc. 73). On June 12, 2013, Bell, Schaben, Schloesser, Griffin, and Abendroth sent plaintiff a second letter reiterating their intent to "end . . . call sharing in any circumstances with you and your clinic." Id. at ¶ 46. In response to plaintiff's request for further clarification, Abendroth sent an email several days later stating, in relevant part:

> the neurology call group comprised of Drs. Abendroth, Bell, Griffin, Schaben and Schloesser will not be providing any call coverage for your patients. You are responsible for covering your patients 24/7 or arranging appropriate coverage in your absence, which includes coverage for your patients if they present to the ER or are admitted to the hospital and require, in person, neurological care. If you, or an appropriate covering provider, are not available to respond in a timely manner, the medical staff president will be notified by the ER or admitting provider to request coverage of the patient as an unassigned patient, and an EMS report filed.

---

[1] "Call schedules are created in six month intervals, beginning on the first of the year [such that] July 1, 2013 marked the first day of the new six month call schedule." Ireland, 2017 WL 3404970 at *3 n.1 (citation and internal quotations omitted).

Id. at ¶ 47. While Buchholz was not a signatory to either letter, he nonetheless stopped sharing call coverage with plaintiff on July 1, 2013. Id. at ¶¶ 45-47, 51.

In "the spring of 2014," plaintiff "was offered [a] job" in Meridian, Idaho, "where he could obtain call coverage." Id. at ¶¶ 44, 105. Plaintiff could not afford to relocate without first "leasing or selling his medical office building [and equipment]." Id. Due to "the real estate downturn in 2007," plaintiff had to sell his MRI and office building "at a significant discount to [their] likely future value." Id. at ¶ 105. Plaintiff ultimately "resign[ed] his hospital privileges" at SCMC and relocated to Meridian in August 2015, although his family elected to stay in Bend, resulting in moving expenses, "significantly increased living expenses," "significant travel expenses," and an impaired quality of life. Id. at ¶¶ 19, 106-11.

On October 26, 2016, plaintiff commenced this lawsuit. Between November 2016 and January 2017, defendants separately moved to dismiss this action in its entirety. On August 8, 2017, the Court granted defendants' motions and instructed plaintiff that any motion to amend must be filed within fourteen days. Ireland, 2017 WL 3401268 at *1. On August 22, 2017, plaintiff moved for leave to file an amended complaint, reasserting the following claims: (1) unlawful conspiracy in the restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1; and (2) intentional interference with economic relations ("IIER"). FAC ¶¶ 112-47 (doc. 73).

**STANDARD OF REVIEW**

Leave to amend pleadings "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Courts apply Rule 15 with "extreme liberality." Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1051 (9th Cir. 2003) (citations omitted). In determining whether a motion to amend should be granted, the court generally considers four factors: (1) undue delay; (2) bad

faith; (3) futility of amendment; and (4) prejudice to the opposing party. Forsyth v. Humana, Inc., 114 F.3d 1467, 1482 (9th Cir. 1997) (citation omitted). These factors are not weighted equally: "futility of amendment alone can justify the denial of a motion [to amend]." Ahlmeyer v. Nev. Sys. of Higher Educ., 555 F.3d 1051, 1055 (9th Cir. 2009).

## DISCUSSION

Plaintiff requests leave to amend his complaint to "provide . . . new factual allegations and cure deficiencies." Pl.'s Mot. Amend 2 (doc. 73). Defendants argue plaintiff's motion should be denied as the "proposed amendments are repetitive and clearly futile" in that they do not cure the identified deficiencies. BMC's Opp'n to Mot. Amend 3 (doc. 74); BNA's Opp'n to Mot. Amend 1 (doc. 75); Buchholz's Opp'n to Mot. Amend 2 (doc. 76).

**I.  Preliminary Matter**

The Court must resolve an issue related to damages before determining the viability of plaintiff's proposed amendments. In relation to his Sherman Act claim, plaintiff alleges harm due to defendants' refusal to provide call coverage in July 2013, which resulted in impairment of his personal finances and quality of life, as well as the suppression of competition. FAC ¶¶ 41, 49, 112-30 (doc. 73). Conversely, for his IIER claim, plaintiff asserts he experienced no damages until he relocated to Meridian in August 2015, years after the conduct giving rise to his Sherman Act claim started. Id. at ¶ 145.

"Judicial estoppel . . . also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." Wagner v. Prof'l Eng'rs in Cal. Gov't, 354 F.3d

1036, 1044 (9th Cir. 2004) (citation omitted). Judicial estoppel applies to an "expression of intention, a statement of fact, or a legal assertion." Id. (citation omitted).

Plaintiff is judicially estopped from taking inconsistent positions as to when he first experienced an alleged injury. For purposes of this motion, the Court will analyze both damages theories. Any future proposed amendments must nonetheless be consistent concerning when the harm first occurred.

## II. Federal Claim

Plaintiff's original complaint failed to state a claim under § 1 of the Sherman Act as it did not allege any injury to competition or consumer welfare. Ireland, 2017 WL 3404970 at *4-5. Specifically, the well-plead factual allegations were directed at the harm suffered personally by plaintiff, as opposed to any overarching anticompetitive effect. Id.

To state a § 1 Sherman Act claim under the rule of reason, the plaintiff must allege: "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition; and (4) that they were harmed by the defendant's anti-competitive contract, combination, or conspiracy, and that this harm flowed from an anti-competitive aspect of the practice under scrutiny." Collegenet, Inc. v. College Appl., Inc., 104 F.Supp.3d 1137, 1145-46 (D. Or. 2015) (citations and internal quotations omitted); see also Austin v. McNamara, 979 F.2d 728, 738 (9th Cir. 1992) ("refusals to 'cover' [even if] somehow intended to lead to a denial of staff privileges" must be analyzed pursuant to the rule of reason, as opposed to receiving per se treatment).

Pursuant to the third and fourth elements, the plaintiff must demonstrate "the conduct at issue actually caused injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged." Metro Indus., Inc. v. Sammi Corp., 82 F.3d 839, 847 (9th Cir. 1996) (citation and internal quotations omitted); see also Kaplan v. Burroughs Corp., 611 F.2d 286, 291 (9th Cir. 1979) ("the elimination of a single competitor, standing alone, does not prove anticompetitive effect") (citation omitted). In other words, "reduction of competition does not invoke the Sherman Act until it harms consumer welfare." Metro Indus., Inc., 82 F.3d at 848 (citation and internal quotations omitted); see also Collegenet, Inc., 104 F.Supp.3d at 1147 ("[b]ecause Congress designed the Sherman Act to protect consumers or purchasers of goods in a market, the focus of the antitrust injury analysis is the direct result of anticompetitive conduct on consumers") (internal citations and quotations omitted).

Plaintiff proposes the following factual allegations to cure deficiencies with regard to his Sherman Act claim:

(1) "The elimination of Plaintiff and his clinic from the market immediately reduced the number of competing neurologists practicing in Bend and eliminated one third of the area's competing neurology clinics."

(2) "As a result the elimination of Plaintiff and his clinic from the market, the output of neurologic services in the Bend decreased and Bend area patients with neurologic problems were denied access to their choice of neurologist, timely access to a neurologist and, in many cases, access to any neurologist."

(3) "Patients with established treating relationships with Plaintiff and many referring physicians suffered the loss of a neurologist they liked and trusted and, in many cases, preferred to any Defendant — a significant injury to consumer welfare."

(4) "The shortage of neurological services in Bend, following the elimination of Plaintiff and his clinic from the market, has been so severe that **The Bend Bulletin**, Bend's major newspaper, reported this shortage in a November 5, 2016 front-page article titled *Neurologists in Short Supply in Bend.* Drs. Bell and Griffin and Dr. Steven Goins (a neurologist employed by BMC after Dr.

Buchholz retired) are quoted in the article. The statements attributed to these doctors accurately state the injury to competition and consumer welfare caused by Defendants unlawful combined conduct. Referring to the shortage, Dr. Bell is quoted: 'It's been brutal. We've had to turn away all kinds of stuff. We have literally had to close our doors to 95 percent of dementia referrals.' In the same article, referring again to the shortage of neurologists in Bend, Dr. Griffin is quoted: 'That's really not ideal. I feel like I'm compromising the quality of care I'd like to provide patients.' Also in the same article, Dr. Goins is quoted: 'We've been so busy we had to shut down our practice to new referrals about three months ago.'"

(5) "The crisis in delivery of neurological care in Bend described by **The Bend Bulletin** and admitted by Drs. Bell, Griffin and Goins was the direct result of the elimination of Plaintiff and his clinic from the market and not related to other factors. Bend Memorial Clinic and Bend Neurological Associates had the same number of neurologists (three each) the day the Plaintiff left Bend, August 17, 2015, as the day **The Bend Bulletin** reported the crisis in neurology care delivery, November 5, 2016. This injury to consumer welfare is solely related to the decrease in output caused by the elimination of the Plaintiff and his clinic from the market."

(6) "By restricting access to neurological care, Defendants' collusive anticompetitive scheme has caused, and will continue to cause, patients requiring such care to suffer — some may have died and others may die in the future as a consequence of Defendants' unlawful conduct."

(7) "Although, without benefit of discovery, Plaintiff cannot know the effect Defendants' conduct has had on prices, basic economics predicts that the reduction in output caused by Defendants' anticompetitive conduct will increase the prices for neurological services."

(8) "Because almost all patients with dementia are insured by Medicare or Medicaid, Dr. Bell's comments illustrate how Defendants' anticompetitive conduct and cherry-picking strategies have had a disproportionate adverse effect on patients enrolled in these low-paying insurances, a consequence of the conspiracy's goal to eliminate competition for commercially insured patients so that they could fill their practices with these higher-paying patients."

FAC ¶¶ 86-89, 91-97, 101 (doc. 73). Defendants contend these "new" allegations are repetitive of earlier filings and fail to state a claim for relief.[2] Buchholz's Opp'n to Mot. Amend 2 (doc.

---

[2] BMC provides a demonstrative table outlining where plaintiff's "new" allegations can be found in the initial complaint and earlier filings. BMC's Opp'n to Mot. Amend 3-4 (doc. 74).

76); BMC's Opp'n to Mot. Amend 2 (doc. 74). A proposed amendment is futile if it would be immediately "subject to dismissal." Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1298 (9th Cir. 1998).

Initially, the Court notes, although phrased differently, the FAC's factual recitations are substantively similar to the allegations raised by plaintiff in his initial complaint. Compare generally FAC (doc. 73), with Compl. (doc. 1). As such, the Court largely considered the FAC's allegations in finding dismissal of the original complaint was warranted. Ireland, 2017 WL 3404970 at *4-5; see also BMC's Opp'n to Mot. Amend 2 (doc. 74) (noting the FAC "reiterates the same contentions using the same facts this Court found insufficient to show entitlement to any claim for relief").

Regardless, the FAC fails to adequately allege an injury to competition. Plaintiff asserts his removal from the market directly caused a neurologist shortage in Bend, which affected patients' quality of and timely access to care. FAC ¶¶ 86-89, 91-97, 101 (doc. 73). In support of this assertion, plaintiff relies on the November 2016 Bend Bulletin article. Id. at ¶¶ 91-92. However, this article, when read in its entirety, does not support the FAC.[3] Notably, the article explains: "Central Oregon has been undersupplied for some time, but the retirement of three veteran neurologists and the departure of another has cut the number from a high of 10 neurologists five years ago, down to six." *Neurologists in Short Supply in Bend: Lack of specialist in Central Oregon Undermining Alzheimer's and Dementia Care*, THE BULLETIN, (Nov. 5, 2016), http://www.bendbulletin.com/health/4780267-153/neurologists-in-short-supply-in-bend.

---

[3] Since this article is incorporated by reference into the FAC and part of the public record, the Court can consider it in evaluating plaintiff's motion. Fed. R. Evid. 201.

In other words, Bend has had a long-standing shortage of neurologists, exacerbated by the departure of four physicians over a five year period. Id. As a result, the injuries to competition and consumer welfare identified in the FAC cannot have been caused exclusively by the more recent departure of plaintiff or defendants' alleged conspiracy. Additionally, this article identifies several hurdles to Bend neurologist recruitment, all of which pre-existed defendants' alleged conspiracy. Id. Even if, contrary to the article, a neurologist shortage did not exist before plaintiff left, acts that cause the elimination of a single competitor alone are insufficient to show a substantial impact on the market. See Austin, 979 F.2d at 739 (elimination of a single neurosurgeon from the market is not sufficient to show an anticompetitive effect).

Further, the FAC's assertion relating to increased prices remains hypothetical and therefore cannot serve as the basis of a Sherman Act claim. Perry v. Rado, 504 F.Supp.2d 1043, 1048-49 (E.D. Wash. 2007), aff'd, 343 Fed.Appx. 240 (9th Cir. 2009). The Court notes, given the length of time that has elapsed since defendants' alleged conspiracy, any resulting price increases would have been realized by now.

Accordingly, the FAC fails to rectify deficiencies discussed in the Court's prior opinion. The FAC instead merely reasserts allegations this Court previously considered and rejected. Thus, plaintiff's motion should be denied as to the FAC's Sherman Act claim.

### III. Defendant Buchholz

The initial complaint failed to state a claim against Buchholz because it did not adequately allege Buchholz's conspiracy participation. Ireland, 2017 WL 3404970 at *5. Namely, because Buchholz's alleged conduct may have been consistent with either permissible competition or an illegal conspiracy, it was not sufficient under the Sherman Act. Id.; see also

Mastsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 597 n.21 (1986) ("[c]onduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy") (citation omitted).

Plaintiff proposes the following additional factual allegations to cure the deficiencies related to Buchholz:

(1) "Dr. Buchholz, along with the other Defendants, refused to continue to provide call coverage for Plaintiff beginning July 1, 2013, the same date described as the 'effective' date for the boycott in the first letter sent informing Plaintiff of the boycott."

(2) "In his Sur-Reply in support of his Motions to Dismiss, Dr. Buchholz admits to his involvement with the conspiracy stating '[H]e chose to go along with the other [Defendants].' . . . Dr. Buchholz knew of the other Defendants' conspiracy and chose to 'go along' with it. If one has knowledge of a conspiracy and goes along with it, they have joined it. At the very least, Dr. Buchholz admits to tacitly agreeing to join the conspiracy."

(3) "On July 1, 2013, Dr. Abendroth informed the answering service, used jointly by all neurologists in Bend, that Dr. Buchholz would no longer accept calls from Plaintiff's patients. This fact clearly indicates that Dr. Buchholz's refusal to continue to provide call coverage stemmed from an agreement rather than an independent business decision."

(4) "On January 18, 2013, Plaintiff sent Dr. Buchholz an email requesting that Dr. Buchholz delay his withdrawal from Neurology of Bend . . . (at that time scheduled for April 3, 2013) for six months so that the Plaintiff would have more time to engage an associate. Dr. Buchholz responded that he would delay his withdrawal 'until 6/30/2013 (effective 7/01/2013).' The Plaintiff asked for a six-month extension and Dr. Buchholz countered with an offer to stay an additional 88 days, not three months or 90 days. The date of his proposed withdrawal coincided with the date the coordinated boycott started."

(5) "Mr. Lynch, in response to Plaintiff's June 28, 2013 letter warning of legal consequences for anticompetitive conduct in restraint of trade, indicated that he represented Dr. Buchholz and all the other Defendants, a fact that strongly suggests that Dr. Buchholz was part of the conspiracy at that time."

(6) "Dr. Buchholz did not have to choose between taking call with Plaintiff and the other Defendants. He could have chosen to continue to share call with everyone, just as he had been doing for many years."

(7) "If Dr. Buchholz had refused to cover Plaintiff's patients because of an independent business or personal reason he could have done so at any time by simply so informing the hospital and Plaintiff. He did not need to wait until July 1, 2013. Refusing to share call with Plaintiff did not change which neurologist was designated as on call for the hospital. On two separate occasions, Dr. Buchholz refused to share call with neurologist who retired before July 1, 2013. His refusal began, in both instances, in the middle of an existing call schedule. He chose to begin to refuse to cover Plaintiff's patients on July 1, 2013 because that is when he and the other Defendants agreed to start their unlawful group boycott."

FAC ¶¶ 51-60 (doc. 73). Buchholz contends the FAC "does not add any new facts which alter the legal analysis in any way and allowing [it] would be a waste of time." Buchholz's Opp'n to Mot. Amend 2 (doc. 76).

The Court notes the FAC makes factual allegations not seen in the previous complaint.[4] The FAC's new allegations, however, do not plausibly eliminate legitimate business reasons for Buchholz's actions. While plaintiff alleges an illegal explanation for Buchholz's behavior, "courts must consider obvious alternative explanations . . . when analyzing plausibility." Name.Space, Inc. v. Internet Corp. for Assigned Names & No.'s, 795 F.3d 1124, 1130 (9th Cir. 2015) (citation omitted).

Indeed, the FAC expressly acknowledges plausible legitimate business reasons for Buchholz to end his professional relationship with plaintiff, including: an expressed a desire to work with BMC (resulting in a legal dispute with plaintiff and NOB) almost a year before the alleged conspiracy began, a history of choosing to not share call with other doctors, and a desire

---

[4] Although these facts were not raised in the initial complaint, most were presented in earlier briefings and considered by the Court when deciding defendants' motions to dismiss. See Buchholz's Opp'n to Mot. Amend 2 (doc. 76) (providing a demonstrative table comparing the FAC's allegations to facts previously raised by plaintiff in opposing dismissal).

to not be on call every other night. FAC ¶¶ 50, 60, 80 (doc. 73). While plaintiff argues it would have been possible for Buchholz to share call with everyone, deciding against doing so does not nullify the legality of his decision. See Ireland, 2017 WL 3404970 at *5 ("plaintiff recognizing that any of the defendants, individually or as an independent group, could have refused to cover his patients without violating the law") (citation and internal quotations and brackets omitted). In sum, there are a number of plausible legitimate business reasons Buchholz chose not to share call with plaintiff absent any illegal motivation.

In addition, the FAC still fails to allege Buchholz's direct involvement with the conspiracy. Essentially plaintiff alleges only that Buchholz elected to share call with the other call group, which is inadequate as discussed in the Court's previous opinion. Id. Subsequently, plaintiff's motion should be denied as to Buchholz.

### IV.     State Claim - Statute of Limitations

The Court found plaintiff's IIER claim unviable because it was time-barred given his injury occurred July 1, 2013, when defendants would no longer share call coverage. Id. Plaintiff contends the date of injury employed by the Court was incorrect and therefore the statute of limitations has not yet run. Pl.'s Mot. Amend 12 (doc. 73).

IIER claims are subject to a two year statute of limitations that "accrues when the interference in fact causes injury." Butcher v. McClain, 244 Or.App. 316, 321-24, 260 P.3d 611 (2011) (citing Or. Rev. Stat. § 12.110(1)).

The FAC evinces plaintiff knew of the injuries that form the basis of this lawsuit contemporaneous to when they occurred. Specifically, plaintiff received notice of defendants' decision not to share call by no later than July 1, 2013. FAC ¶¶ 45-50 (doc. 73). It was clear from

plaintiff's June 2013 correspondence that he was immediately concerned about the lack of call coverage and the potential illegality of defendants' actions. Id. at ¶ 49.

Plaintiff proposes the following allegation to cure issues with his IIER claim: "[p]laintiff experienced no damage to any of his contractual and business relationships and received full benefit from all these relationships until he was forced to close his practice and relocate to Idaho in August 2015." Id. a ¶ 145 (emphasis removed). Plaintiff elaborates:

> Because Defendants were the only physicians with hospital privileges capable of providing call coverage for Plaintiff, their unlawful coordinated group boycott placed Plaintiff in the unsustainable position, pursuant to hospital rules and regulations, of having to remain available to be at the hospital within 40 minutes, 24 hours a day/365 days a year. By extending the group boycott to Plaintiff's clinic and combining the boycott with the threat they would take action against Plaintiff's hospital privileges and damage or end his career, Defendants achieved their ultimate goal of eliminating Plaintiff and his clinic from the market. To preserve his career, Plaintiff had no choice but to close his practice in Bend, resign his hospital privileges, terminate his contractual relationships with health insurance providers, abandon business relationships he had established over 23 years of practicing neurology in Bend, and relocate to another area of the country — eliminating him and his clinic as competitors.

Id. at ¶¶ 6, 141. Plaintiff further alleges he "could not leave Bend until he sold or leased his medical office building and secured employment as a neurologist in a location where he had call coverage." Id. at ¶ 142.

The fact plaintiff may not have realized the full extent of his damages, noneconomic or otherwise, until a later date is irrelevant. See Or. Nerve Ctr., LLC v. Lawlor Winston, LLP, 2013 WL 504324, *8 (D. Or. Feb. 7, 2013) ("[w]here it is clear that a harm has occurred, the full extent of [IIER] damages need not be determined for the limitations period to commence") (citing Jaquith v. Ferris, 297 Or. 783, 788, 687 P.2d 1083 (1984)). As discussed in Section I, plaintiff asserts he experienced no damages until he sold his practice in August 2015, but this is

inconsistent with allegations that his finances and quality of life were impaired at the time defendants refused call coverage two years prior. Compare FAC ¶¶ 120-21 (doc. 73), with id. at ¶¶ 41, 44, 145. Although plaintiff ultimately chose not to commence this lawsuit until after he closed his practice and relocated, the FAC demonstrates he was aware that he had been injured as of July 1, 2013. See Or. Nerve Ctr., 2013 WL 504324 at *8 (dismissing aspects of an IIER claim as untimely under analogous circumstances). As a result, his IIER claim is time-barred.

## V.      State Claim - IIER Elements

The Court found the original complaint failed to allege the requisite elements of IIER – namely, an improper means or purpose. Ireland, 2017 WL 3404970 at *6. An "improper purpose" exists when a defendant intentionally interferes with the plaintiff's "business relationship but also had a duty of non-interference;" i.e. interference was for an "improper purpose rather than a legitimate one." Pendleton Woolen Mills, Inc. v. Kraff's Men's Wear Co., Inc., 2015 WL 12966313, *4 (D. Or. Feb. 25, 2015) (citing N.W. Natural Gas, Co. v. Chase Gardens, Inc., 328 Or. 487, 498, 982 P.2d 1117 (1999)). An "improper means" exists when interference is independently wrongful by reason of statutory law, common law, or a recognized standard of a trade or profession." Conklin v. Karban Rock, Inc., 94 Or.App. 593, 601, 767 P.2d 444 (1989); Top Serv. Body Shop v. Allstate Ins. Co., 283 Or. 201, 209-10, n.11, 582 P.2d 1365 (1978).

The FAC alleges "[d]efendants interfered with Plaintiffs' [sic] contractual and business relationships by using the improper means of a coordinated group boycott — in violation of § 1 of the Sherman Act — for the improper purpose of eliminating competition." FAC ¶ 139 (doc. 73).

As discussed above, the FAC does not adequately plead a Sherman Act violation, so that proffered statutory violation cannot be relied on to support the existence of an improper means or purpose. Conklin, 94 Or.App. at 601. Furthermore, plaintiff recognizes call coverage was voluntary, so no business standard could have been violated by defendants' choice not share call. FAC ¶¶ 38, 49 (doc. 73); Ireland, 2017 WL 3404970 at *5-6. Since an objective standard has not been violated, improper means has not been adequately alleged. N.W. Natural Gas, Co., 328 Or. at 498 (citation omitted). Likewise, because defendants have provided legitimate business motives to explain their choices, improper purpose has not been adequately alleged. Ireland, 2017 WL 3404970 at *6; see also Eusterman v. N.W.. Permanente, P.C., 204 Or.App. 224, 238, 129 P.3d 213, rev. denied, 341 Or. 579, 146 P.3d 884 (2006) (for a purpose to be improper, it must be wholly inconsistent with legitimate business motives). Plaintiff's motion should be denied as to the FAC's IIER claim.

## RECOMMENDATION

Plaintiff's Motion to Amend (doc. 73) should be DENIED. Nevertheless, due to plaintiff's pro se status, plaintiff should be allowed one final opportunity to seek amendment in accordance herewith. Any motion to amend should be filed within fourteen days of the District Judge's Order.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the

parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

    DATED this 6th day of November 2017.

                                                    s/Jolie A. Russo
                                                    JOLIE A. RUSSO
                                                    United States Magistrate Judge