UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| STEPHEN IRELAND, M.D., an individual, | Case No. 6:16-cv-02054-MK |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| BEND NEUROLOGICAL ASSOCIATES LLC, an Oregon limited liability company; BEND MEMORIAL CLINIC, P.C., an Oregon professional corporation; MICHAEL BELL, M.D., P.C., an Oregon professional Corporation; MICHAEL BELL, M.D., an individual; DAVID T. SCHLOESSER, M.D., P.C., a professional corporation; DAVID SCHLOESSER, M.D., an individual; LAURA J. SCHABEN, M.D., P.C., a professional Corporation; LAURA SCHABEN, M.D., an individual; FRANCENA ABENDROTH, M.D., an individual; CRAIGAN GRIFFIN, M.D., an individual; GARY BUCHHOLZ, M.D., an individual, and GARY D. BUCHOLZ, M.D., P.C., an Oregon professional corporation, | |
| Defendants. | |

**KASUBHAI,** United States Magistrate Judge:

*Pro se* Plaintiff Stephen Ireland filed this lawsuit against Defendants, asserting claims for unlawful conspiracy in restraint of trade in violation of 15 U.S.C. § 1, and tortious intentional

1 — OPINION AND ORDER

interference with economic and business relationships in violation of Oregon common law. Currently before the Court are Plaintiff's Amended Motion for Partial Summary Judgment and (ECF Nos. 153); Defendants Buchholz's Motion for Summary Judgment (ECF No. 147); Defendants BMC's, Griffin's, and Abendroth's Motion for Summary Judgment (ECF Nos. 149); and Defendants BNA's, Bell's, Schaben's, and Schloesser's Motion for Summary Judgment (ECF No. 151). For the reasons set forth below, Defendants' Motions for Summary Judgment (ECF Nos. 147, 149, 151) are GRANTED; Plaintiff's Amended Motion for Summary Judgment (ECF No. 153) is DENIED.

## BACKGROUND

Plaintiff and Defendants Schloesser, Bell, Buchholz, Schaben, Abendroth, and Griffin (the "individual Defendants") work as neurologists. Ireland Decl. ¶ 5, ECF No. 154. Prior to September 2015, Plaintiff and the individual Defendants practiced in Bend, Oregon, with hospital privileges at St. Charles Medical Center-Bend ("SCMC"). *Id.* ¶ 5. Insurance providers "in the Bend service area require that physicians provide hospital coverage for their patients[.]" *Id.* ¶ 49. Similarly, SCMC's regulations require physicians to supply emergency call-coverage for their patients. *Id.* ¶ 7. Emergency call-coverage in turn requires a physician to be within 40 minutes of travel distance to the hospital in the event their patients require immediate and in-person evaluation. *Id.* ¶¶ 42, 44. Failure to comply with SCMC's call-coverage requirements "can result in disciplinary action, including the loss of medical staff privileges." *Id.* ¶ 46.

Plaintiff opened his own clinic, Neurology of Bend ("NOB"). *Id.* ¶ 4. At all relevant times, Schloesser, Bell, and Schaben practiced for Bend Neurological Associates ("BNA") while Abendroth and Griffin were employed by Bend Memorial Clinic ("BMC"); Buchholz joined BMC in April 2014, where he continued to practice until March 2016. *Id.* ¶¶ 35, 37, 40.

Beginning in Spring 2013, Plaintiff, BNA, and BMC were recruiting neurologists for their respective practices. *Id.* ¶ 13. Bell, Schaben, Schloesser, Griffin, and Abendroth sent Plaintiff a letter in June 2013, informing him that, beginning July 1, 2013, they would no longer call share with Plaintiff and his practice.[1] *Id.* ¶ 51. Bell, Schaben, Schloesser, Griffin, and Abendroth sent Plaintiff a second letter on June 12, 2013, reiterating their intent to end call sharing and instructing Plaintiff to make alternative arrangements for call-coverage. *Id.* at ¶ 52. In response to Plaintiff's request for further clarification, Abendroth sent an email several days later stating, in relevant part:

> [T]he neurology call group comprised of Drs. Abendroth, Bell, Griffin, Schaben and Schloesser will not be providing any call coverage for your patients. You are responsible for covering your patients 24/7 or arranging appropriate coverage in your absence, which includes coverage for your patients if they present to the ER or are admitted to the hospital and require, in person, neurological care. If you, or an appropriate covering provider, are not available to respond in a timely manner, the medical staff president will be notified by the ER or admitting provider to request coverage of the patient as an unassigned patient, and an EMS report filed.

*Id.* ¶ 53. Buchholz was not listed in this letter but joined the other individual Defendants in terminating their call coverage arrangement with Plaintiff on July 1, 2013. *Id.* ¶ 56.

Plaintiff later accepted a job in Meridian, Idaho, where he could obtain call coverage. *Id.* ¶¶ 17, 112. However, Plaintiff could not afford to relocate without first "leasing or selling [his] medical office building [and equipment]." *Id.* And due to "the real estate downturn in 2007[,]" Plaintiff sold his medical building as "soon as possible and, ultimately, sold it at a significant discount to its likely future value." *Id.* Plaintiff closed NOB, "resigned [his] hospital privileges"

---

[1] "Call schedules are created in six-month intervals, beginning on the first of the year [such that] July 1, 2013 marked the first day of the new six-month call schedule." *Ireland v. Bend Neurological Assocs. LLC*, No. 6:16-cv-02054-JR, 2017 WL 3404970, at *2 n.1 (D. Or. May 23, 2017) (bracketing in original), *adopted*, 2017 WL 3401268 (D. Or. Aug. 8, 2017) ("*Ireland I*").

at SCMC, "terminated [his] contractual relationships with health insurance providers," and relocated to Idaho in August 2015. *Id.* ¶¶ 17, 19. Plaintiff's family, however, elected to stay in Bend, resulting in "emotional pain, suffering and humiliation" for Plaintiff. *Id.* ¶ 118.

## PROCEDURAL HISTORY

Plaintiff filed this action in October 2016. Compl., ECF No. 1. In November 2016, Defendants Buchholz, BNA, and BMC filed Motions to Dismiss for Failure to State a Claim, which this Court ultimately granted. *See* ECF Nos. 7, 31, 32, 62, 72. Plaintiff filed a Motion for Leave to File an Amended Complaint and a Motion for Disqualification, both of which were denied in December 2017. ECF Nos. 79, 81, 89, 91. Plaintiff filed a second Motion for Leave to File an Amended Complaint which the Court dismissed with prejudice. ECF Nos. 92, 108.

Plaintiff subsequently appealed the Court's dismissal to the Ninth Circuit in April 2018. ECF No. 111. The Ninth Circuit affirmed the dismissal of a *per se* violation of the Sherman Act; however, the court vacated and remanded Plaintiff's "rule of reason" Sherman Act claim as well as the IIER claim under Oregon law. ECF No. 112; *Ireland v. Bend Neurological Assocs., LLC*, 748 F. App'x 166, 167 (9th Cir. 2019) ("Liberally construed, the proposed second amended complaint contains sufficient allegations that defendants' decision to terminate call coverage for Ireland's patients was intended to restrain competition unreasonably and actually caused injury to competition that harmed consumer welfare."); *id.* ("Because we conclude that the district court erred by dismissing the "rule of reason" Sherman Act claim, we conclude that the district court erred by dismissing Ireland's IIER claim."). However, the Ninth Circuit limited the scope of Plaintiff's antitrust claim on remand to the "rule of reason" framework and considered relevant whether the putative wrongdoing unreasonably restrains competition and thereby harms consumer welfare. *Id.* As noted, the parties have cross-moved for summary judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630.

Generally, summary judgment in antitrust cases is inappropriate because of their factual complexity. *See Rickards v. Canine Eye Registration Found.,* 783 F.2d 1329, 1332 (9th Cir. 1986). However, a district court may award summary judgment when appropriate. The Supreme Court's decision in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* clarified the standards for resolving summary judgment cases in antitrust cases. 475 U.S. 574, (1986); *see also Bhan v. NME Hosps., Inc.,* 929 F.2d 1404 (9th Cir. 1991) (affirming district court's grant of summary judgment in antitrust case).

# DISCUSSION

## I. Sherman Act "Rule of Reason" Claim

Defendants assert that summary judgment is appropriate on Plaintiff's § 1 Sherman Act Claim. The Ninth Circuit has explained regarding Rule of Reason Claims:

> Our traditional framework for analyzing a rule of reason claim under section one of the Sherman Act is well settled and easily summarized. A section one claimant must initially prove three elements: (1) an agreement or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intend to harm or restrain competition; and (3) which actually injures competition.
>
> After the claimant has proven that the conspiracy harmed competition, the fact finder must balance the restraint and any justifications or pro-competitive effects of the restraint in order to determine whether the restraint is unreasonable. This balancing process requires a thorough examination into all the surrounding circumstances.

*Oltz v. St. Peter's Cmty. Hosp.,* 861 F.2d 1440, 1445 (9th Cir. 1988) (citations omitted); *Austin v. McNamara*, 979 F.2d 728, 738–740 (9th Cir. 1992) (listing the elements required for Rule of Reason claim and concluding that failure to establish anyone of the three elements is dispositive) (citation omitted); *see also Austin v. McNamara,* 979 F.2d 728, 738 (9th Cir. 1992) ("refusals to 'cover' [even if] somehow intended to lead to a denial of staff privileges" must be analyzed pursuant to the Rule of Reason). Here, as explained below, Plaintiff's inability to establish the second element is fatal to his Rule of Reason claim. However, even if he were able to establish a *prima facie* case, his claim fails under the mandatory balancing inquiry.

Summary judgment for a defendant is appropriate on a Sherman antitrust claim where a Plaintiff fails to present "evidence that the agreement. . .was motivated by a desire to curtail competition." *Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.*, 833 F.2d 208, 211 (9th Cir. 1987). Significantly, beyond his purely speculative conclusions, Plaintiff has not presented any

admissible evidence that Defendants' decision to no longer call share with Plaintiff was motivated by a desire to curtail competition within the meaning of a Sherman antitrust claim. This alone makes summary judgment appropriate.[2]

Even assuming *arguendo* that Plaintiff could establish Defendants engaged in "an agreement, conspiracy, or combination among two or more persons or distinct business entities, which was intended to harm or unreasonably restrain competition, and actually caused injury to competition," and after "a thorough examination into all the surrounding circumstances," pursuant to a Rule of Reason analysis compels the Court to conclude that Plaintiff's claim fails. *Oltz*, 861 F.2d at 1445. Under the Rule of Reason burden shifting scheme, after Plaintiff establishes harm to market competition, "the burden then shifts to defendants to offer evidence that a legitimate objective is served by the challenged behavior." *Tuolumne*, 236 F.3d 1159.

Assuming without deciding that Defendants decision to terminate their call coverage relationship with Plaintiff harmed the market, Defendants' decision to do so to optimize patient health was legitimate. Defendants testified that "[Plaintiff's] relationship with each of the

---

[2] As to the third element, Plaintiff has additionally failed to establish an actual injury to competition. Although Plaintiff argues that Defendants' coordinated exclusion from the call group forced him to relocate his practice out of state the evidence in the record fails to support the assertion. As Defendants correctly note, even after the new call group was formed, "[Plaintiff] continued to practice in Bend and at St. Charles Medical Center-Bend for several years after the split." BNA Mot. Summ. J. at 17, ECF No. 151. Plaintiff's own deposition testimony demonstrates that he continued to treat patients even after the ending of call coverage with Defendants, signifying lesser harm than what Plaintiff testifies. Ireland Dec. Ex 18 (11:15-19). Critically, the Ninth Circuit "has held that the *elimination* of a single competitor, standing alone, does not prove anticompetitive effect." *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1158–59 (9th Cir. 2001) ("*Tuolumne*") (emphasis in original) (citing *Austin v. McNamara*, 979 F.2d 728, 739 (9th Cir.1992); *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979) ("Even if sufficient proof of intent and causation are introduced, the elimination of a single competitor, standing alone, does not prove anticompetitive effect."). Moreover, Plaintiff testified that he was not aware of evidence that prices for neurological services were impacted by Defendants' conduct. Ireland Decl., Ex. 18 (188:15–18).

neurologists became strained to varying degrees." Ireland Dec. Ex. 18. (146:9–24, 148:13, 152:1–153:13). Defendants testified that on several occasions "[they] expressed concerns that poor communication with [Plaintiff] was disruptive and harmful to patients." Schaben Dec. Ex. 23 (106:06–08); *see also* Schloesser Dec. Ex. 24 (149:04–22); Bell Dec. Ex. 20 (132:23–133:14); Abendroth Dec. Ex. 19 (91:25–92:07); Griffin Dec. Ex. 22 (70:09–14). BNA Defendants expressed that "[p]atients complained to defendants about [Plaintiff's] abrasive bedside manner, describing it as 'callous' and 'dismissive' of their concerns." Bell Dec. Ex. 20 (84:17–25). BNA Defendants further recalled how "[p]atients and physicians reported multiple instances where [Plaintiff] disparaged [Defendants'] clinical acumen, suggesting they were inferior physicians with poor medical judgment. Ireland Dec. Ex. 18 (98:15–99:05); Bell Dec. Ex. 20 (84:17–25).

Furthermore, "they were not willing to share assigned call coverage 'because the relationship had become non-collegial enough that it would be a problem . . . for patient care." BNA Mot. Summ. J. at 9 (citing Schaben Dec. Ex. 23 (106:06–08, 125:02–07); ECF No. 151. Defendant Schloesser testified "he was no longer 'comfortable' sharing a call with [Plaintiff]," while Defendant Bell expressed "that it was 'potentially dangerous' for his patients to share call with [Plaintiff] because of [Plaintiff's] hostility and aggression towards hospital staff and neurologist peers." Schloesser Dec. Ex. 24 (149:04-22); Bell Dec. Ex. 20 (132:23–133:14). In correspondence with a fellow neurologist, Plaintiff decried:

> To be fair, I find [Defendant Griffin] and [Defendant Schaben] to lack basic competence. So do [Defendants Bell and Schloesser]. [Defendant Bell] is dim-witted and arrogant; [Defendant Schloesser] is dim-witted and unable to focus due to serious psychodynamic conflicts. [Defendant Buchholz] combines a weird inability to see the forrest [sic] for the trees with declining mental acuity and dishonesty. Like [Defendant Bell], [Defendant Buchholz] likes to prey on referring physicians by advancing

> interesting, but preposterous, diagnoses. Have you read [Defendant Buchholz's] notes? You can tell [Defendant Buchholz is] not all there.

*Id*. at 23 (citing Ex. 7), ECF No. 151. The evidence in the record reflects that each Defendant suffered from a combative relationship with Plaintiff that harmed the quality of care that patients received. The Ninth Circuit has held concerns for "optimizing patients' health . . . certainly are legitimate" and the Court finds no reasons to depart from that principle here. *Tuolumne*, 236 F.3d at 1159. In other words, in "balanc[ing] the harms and benefits" of Defendants' decision to terminate their call coverage relationship with Plaintiff "to determine whether they are reasonable, . . . any anticompetitive harm [was] offset by the procompetitive effects of [Defendants'] effort to maintain the quality of patient care that it provides. *Id.*; *see also Weiss v. York Hosp.,* 745 F.2d 786, 820 (3rd Cir. 1984) ("One factor in the effective and efficient running of a hospital is a medical staff that can work together and be courteous to patients and staff. Doctors who have a history of trouble in interpersonal relations can legitimately be excluded because, if admitted, they will reduce the effectiveness of the medical staff, thereby reducing the ability of the hospital to provide top-flight service. In sum, doctors who have trouble getting along with other people will reduce efficiency, thereby reducing the hospital's competitive position, and, therefore, exclusion of such doctors is pro-competitive and permissible under the rule of reason.").

As such, Plaintiff's § 1 Sherman Act claim fails as a matter of law. Defendants motions for summary judgment are GRANTED. Plaintiff's motion is DENIED.

### II. Plaintiff's State Law IIER Claim

Defendants next move for summary judgment on Plaintiff's IIER claim. In order to prevail on an IIER claim at trial, a plaintiff must prove the following six elements: (1) the

existence of a professional or business relationship; (2) intentional interference with that relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to the economic relationship; and (6) damages. *McGanty v. Staudenraus*, 321 Or. 532, 901 P.2d 841, 535 (1995). Because the Court finds there is no genuine issue of material fact relating to the fourth element—whether an "interference" was accomplished through improper means or for an improper purpose—and because all elements must be established at trial if Plaintiff is to prevail, this failure is dispositive and the Court need not address the remaining elements.

Defendants contend that because their decision to cease call coverage with Plaintiff was not accomplished through improper means or for an improper purpose, Plaintiff's IIER claim fails. Buchholz Mot. Summ. J. at 26, ECF No. 147. Plaintiff contends that Defendants intentionally interfered with Plaintiff's business and contractual relations through the improper means of combining to refuse to share call coverage with Plaintiff and his clinic. Ireland Decl. ¶¶ 5, 71, ECF No. 154.

The Oregon Supreme Court has found that a defendant's interference through improper purpose or improper means is a necessary element of the plaintiff's case. *Straube v. Larson*, 287 Or. 357, 374 (1979). To establish improper purpose, a plaintiff must prove that the defendant did not have a legitimate purpose, shown with direct evidence, for actions which resulted in injury to a plaintiff. *Id.* "Improper means" must be independently wrongful by reason of statutory or common law, and include "violence, threats, intimidation, deceit, misrepresentation, bribery, unfounded litigation, defamation and disparaging falsehood." *Conklin v. Karban Rock, Inc.*, 94 Or. App. 593, 601 (1989).

In other words, the means must be wrongful in some manner other than simply causing the damages claimed as a result of the conduct. *Id.*; *see also Straube*, 287 Or. 357 (1979) (finding that the plaintiff's conspiracy claim fails even where the defendants deprived the plaintiff of his staff privileges in the hospital). To prevail, a plaintiff must establish "not only . . . that [a] defendant intentionally interfered with his business relationship but also that [a] defendant had a duty of non-interference, *i.e.*, that [a defendant] interfered for an improper purpose rather than for a legitimate one, or that [a] defendant used improper means which resulted in injury to [a] plaintiff." *Straube*, 287 Or. 357 (1979)

Here, Defendants assert that Plaintiff cannot demonstrate that Defendants acted with improper purpose. Significantly, the record reflects no direct evidence that Defendants acted with improper purpose. Defendants testified to ceasing call coverage for the legitimate purpose of maintaining the quality of patient care. BNA Mot. Summ. J. at 9 (citing Schaben Dec. Ex. 23 (106:06–08, 125:02–07), ECF No. 151. Defendants repeatedly expressed "they were not willing to share assigned call coverage 'because the relationship had become non-collegial enough that it would be a problem . . . for patient care." *Id.*

Defendant Schloesser testified "he was no longer 'comfortable' sharing a call with [Plaintiff]," while Defendant Bell expressed "that it was 'potentially dangerous' for his patients to share call with [Plaintiff] because of [Plaintiff's] hostility and aggression towards hospital staff and neurologist peers." Buchholz Mot. Summ. J. at 20, ECF No. 147; *see also* BMC Mot. Summ. J. at 18, ECF No. 149; BNA Mot. Summ. J. at 27, ECF No. 151.

Defendants testified that they were not aware that Plaintiff intended to leave the Bend market; instead, Defendants understood that Plaintiff was searching for another neurologist to join his practice after the call-sharing agreement ended. Buchholz Mot. Summ. J. at 17, ECF No.

11 — OPINION AND ORDER

147. Plaintiff's inability to find call coverage does not create a genuine dispute of material fact as to whether Defendants' purpose was improper because Oregon courts have flatly rejected that argument. *See*, *e.g.*, *Empire Fire & Marine Ins. Co. v. Fremont Indem. Co.,* 90 Or. App. 56 (1988) ("even if [d]efendant knew that [plaintiff] could not [fulfill] its [contracts], that does not raise a question of fact as to . . . [d]efendant's [purpose]."). Furthermore, the Oregon Supreme Court has previous found that "incidental interference" with a plaintiff's ability to engage in regular business relationships with its economic relationships is not actionable. *Wampler v. Palmerton,* 250 Or. 65, 439 P.2d 601 (1968)*.*

Accordingly, Plaintiff has failed to establish that Defendants acted with "improper means or for an improper purpose" as a matter of law. *McGanty,* 321 Or. 532. As such, Defendants' Motions for Summary Judgment as to Plaintiff's IIER claim are GRANTED.

## CONCLUSION

For the reasons above, Defendants' Motions for Summary Judgment (ECF Nos. 147, 149, 151) are GRANTED. Plaintiff's Amended Motion for Summary Judgment (ECF No. 153) is DENIED.[3]

DATED this 31st day of March 2021.

                                           s/ Mustafa T. Kasubhai
                                           MUSTAFA T. KASUBHAI (He / Him)
                                           United States Magistrate Judge

---

[3] Because the Court finds granting Defendants' Motions for Summary Judgment appropriate, it need not resolve the following motions that are accordingly DENIED as moot: BMC's Motion to Strike and Limit Expert Testimony (ECF No. 150); Plaintiff's Amended Motion for Partial Summary Judgment (ECF No. 153); Plaintiff's Motion to Recharacterize Srinagesh as Principal Expert (ECF No. 159); Plaintiff's Motion to Amend/Correct Declaration (ECF No. 175); and Plaintiff's Motion for Leave to File Surreply (ECF No. 193).